Macdonald, D. Lloyd, J.
This case arises from a serious motor vehicle accident that occurred in South Boston on May 13, 2000. In April 2008 the Court ordered that the trial of the plaintiffs’ claims be bifurcated such that the trial of the defendants Elsie Cab Company (“Elsie Cab” or “Elsie”), Michael Ginsburg (“Ginsburg") and Saffron Walker (“Walker”) proceed first on the common-law counts for negligence and negligent entrustment, to be followed by the trial of a G.L.c. 93A claim against Edward Tutunjian (“Tutunj-ian”), Elsie Cab, Inc. and the remaining corporate defendants.
As will be described in greater detail below, the first trial ended with a verdict for the plaintiffs. Following the entry of judgment against Ginsburg, Walker and Elsie, the Court entered a post-verdict security order in favor of the plaintiffs attaching Elsie’s 15 taxicab medallions.
The claims in the second trial rested on a derivative liability theory premised on the assertion that Tutunj-ian and the corporate entities were alter egos of Elsie Cab according to the principles of My Bread Baking Co. v. Cumberland Farms, 353 Mass. 614 (1968). In their complaint the plaintiffs submitted that the Court ought to exercise its equitable power to pierce the corporate veil that would otherwise limit the plaintiffs’ recovery to Elsie Cab’s corporate assets and Ginsburg’s and Walker’s personal resources.
The plaintiffs rest their claim for G.L.c. 93A relief on the proposition that Elsie Cab and the other Tutunjian taxicab-related entities, as self-insureds, were in fact “engaged in the business of insurance” under G.L.c. 176D, g 1 (a). In that capacity, they allegedly committed unfair settlement practices by misrepresenting that they carried liability insurance policies and, further, that they failed to “effectuate [a] prompt, fair and equitable settlement! ] of [the plainitiffs’] claims in which liability ha[d] become reasonably clear.” Bobick v. United States Fid. & Guar. Co., 439 Mass. 652, 658-59 (2003).
The second trial was tried to the Court and held over a four-day period. (The plaintiffs waived their jury rights with regard to the common-law counts.) 81 exhibits were marked. Further, the parties stipulated that the transcript and exhibits of the April 2008 trial would be admitted as evidence. The Court makes the following findings of fact and rulings of law in support of its ultimate conclusion on the merits in favor of the defendants.
FINDINGS OF FACT
The Accident
1. On May 12, 2000 plaintiff Maureen Hanley (“Hanley”) brought her ten-year-old son, plaintiff Joseph Lisiecki (“Joseph”) via ambulance to Children’s Hospital in Boston because of an allergic reaction to a medication. Hanley is a nurse and lived (and lives) with her husband, the plaintiff Peter Lisiecki, on B Street in South Boston with their two other children. After Joseph was discharged, Hanley used a dedicated phone at the hospital to call a taxi at approximately 5:00 a.m.
2. Shortly thereafter, Ginsburg, driving Boston Cab No. 945 registered to Elsie Cab, arrived at the Children’s Hospital and picked up Hanley and Joseph. Ginsburg then headed to South Boston on a route that took them through Kenmore Square, down Commonwealth Avenue in the Back Bay to Arlington Street, then over the Broadway Bridge to South Boston.
3. The testimony at the trial as to Ginsburg’s speed and operation of the cab differed sharply.
4. Hanley said that Ginsburg rolled through the red light outside of Children’s Hospital and proceeded to speed through the Back Bay at what she estimated to have been 50 miles an hour. Hanley alleged that at the intersection of Columbus Avenue and Arlington Gins *518 burg ran a red light, causing her to scream at him, “Slow down, I’ve got a kid in the car!” She described that Ginsburg continued to speed when they got on Broadway in South Boston and that as they approached the intersection of Broadway and A Street, Ginsburg turned around to ask her which way on B Street she wanted him to turn.
5. Ginsburg testified that at no time did he go over the speed limit of 30 mph and that as he approached the A Street intersection, he slowed down further because of the flashing yellow light prior to accelerating once, he said, that the intersection before him appeared to be clear.
6. The cab, however, did not make it through the intersection.
7. According to Hanley, as Ginsburg turned around to face her to ask directions, she saw on the right side the vehicle driven by Walker coming north on A Street through the West Broadway intersection. Walker’s car crashed into the rear passenger side right where Han-ley and Joseph were seated. See Exhibit AA. A witness at the scene described the cab as becoming “airborne” upon being struck. The impact projected the cab into the opposite lane of travel on West Broadway. Hanley saw a red flashing light and believed that Ginsburg had run it. She screamed profanities in anger at him.
8. Ginsburg denied that he had turned around to speak to Hanley and stated that at all times he had his eyes on the road in front of him. As Hanley later acknowledged, Ginsburg in fact had the right-of-way with a flashing yellow light. It was Walker who had run the red light.
9. Hanley was seriously injured in the accident. She and Joseph were transported by ambulance to the Boston Medical Center. She remained there for two weeks. She suffered a broken jaw and a broken neck. Her jaw was wired shut until the following December. She was fed through straws and tubes. She was fitted with a rigid wraparound back brace, which she wore until October-November of 2000.
10. Despite intensive rehabilitation, through the April 2008 trial Hanley was frequently in acute pain. As a result, she was unable to resume her nursing job. Her medical expenses were in excess of $100,000. She testified that due to the ongoing pain, the intimacies of her relationship with her husband and her maternal relationship with her three sons were fundamentally changed.
11. Although at the time of the accident Joseph was visibly bleeding from the mouth, he was not seriously injured. He was released from the hospital after being stitched up.
12. Ginsburg was extracted from his cab with the Jaws of Life. He was placed on aback board, collared, and taken by ambulance to the hospital. He received follow-up treatments for several months but sustained no lasting injuries.
13. Walker was not injured.
14. Prior to the accident, Ginsburg had been driving a cab in the City of Boston (the “City”) for about 29 years. He did this largely full time, five or six days a week, ten to twelve hours a day. He began driving for Boston Cab in 1990. He always drove as an independent contractor.
15. The police did not cite Ginsburg for speeding or any other violation on account of the accident.
The First Trial
16. The case was tried to a juiy over a period of ten trial days in April 2008. The verdict form contained special questions as to the negligence of Ginsburg, Walker and Elsie Cab. There was a separate question as to the Elsie Cab’s negligent entrustment of the cab to Ginsburg. The final question (to be answered only if the jury found both Ginsburg and Walker negligent) asked the jury to apportion the percentage of negligence between Ginsburg and Walker.
17. After approximately eight hours of deliberation, the jury found Walker and Ginsburg negligent. They found Elsie Cab not negligent, and the jury further found that Elsie had not negligently entrusted the vehicle to Ginsburg.
18. In its allocation of total negligence between Ginsburg and Walker, the jury found Walker 93% negligent and Ginsburg 7% negligent.
19. The jury awarded damages to Hanley of $1,790,044.00, $210,000 to Joseph and $18,000 in consortium damages to Hanley’s husband, Peter.
20. Hanley’s counsel filed a motion for judgment notwithstanding the verdict against Elsie Cab. The Court allowed the motion in a memorandum of decision dated July 3, 2008 and thereafter entered judgment against Walker, Ginsburg and Elsie.
21. Ginsburg did not appeal the judgment against him, and there apparently has been no further occasion for Ginsburg to be represented by counsel in connection with the Hanley claims.
Organization and Operation of Tutunjian’s Taxicab Business
23. Elsie Cab No. 945 was a licensed, franchised taxi within the City carrying a medallion issued by the Hackney Division of the Boston Police Department (“Hackney”). Exhibit CC.
24. The defendant Tutunjian is the sole stockholder, president, treasurer and clerk of Elsie and the other twenty-nine cab company defendants. As to Elsie, see Exhibit 1. Tutunjian is also the sole stockholder, president, clerk, and director of defendant EJT Management, Inc. (“EJT Management”) (Exhibit 3), of defendants Prime Securities, Inc. and the Linwood Grille at Fenway, Inc. and of the remaining corporate defendants.
25. Tutunjian began in the taxi business by driving a cab in the late 1960s after he immigrated to the *519 United States. He bought his first taxi medallion in 1972, and he has been actively in business since.
26. At the time of the Hanley accident, Tutunjian owned approximately 185 medallions. In 2000 he bought the Checker Cab fleet from Frank Sawyer, which added an additional 160 cabs to Tutunjian’s Boston Cab fleet. He currently controls 342 taxi medallions.
27. All of the medallions and cab companies owned by Tutunjian list 60 Kilmarnock Street in the City as their address with the Secretary of State, the Registry of Motor Vehicles, the City and with Hackney. Tutunj-ian owns 60 Kilmarnock Street in Boston. At the April 2008 trial he testified that it is “my garage.”
28. Tutunjian operates his cab business primarily through the “Boston Cab” organization. Boston Cab taxis are painted with distinctive brown and white exterior colors. Tutunjian trademarked the appellation, “Brown and White Fleet,” as part of a branding strategy for marketing his business. Exhibit 5D.
29. Each of the cabs in Tutunjian’s thirty taxicab corporations are painted in the same brown and white color scheme, brown lettering, Boston Cab Association on the rear door, the phone number 536-5010, and in smaller font, “Owned and Operated By” the particular name of the Tutunjian company that owns the cab.
30. As of2006, a “Taxicab Management Agreement” between the individual cab companies and EJT Management was prepared pursuant to which responsibility for day to day operations was placed on EJT Management. It is not clear, however, if it was formally executed. See Exhibit 74.
31. The Tutunjian cab companies and EJT Management are so-called “S” corporations, not “C” corporations. Accordingly, the entities do not file taxes on income. Rather, taxable income is passed through to Tutunjian for payment of taxes in his personal capacity.
32. Elsie and Tutunjian’s other cab companies operate with the object of making profits by leasing cabs to drivers who are independent contractors. A driver who leases a cab from Elsie pays a fixed fee to EJT Management and agrees to return the cab at the end of the lease. On the lease agreement EJT Management is the lessor. The driver is not restricted as to where he may pick up customers during the shift.
33. In accord with the above practice, Ginsburg leased the cab in which Hanley and Joseph were riding on the day of the accident. Exhibit 66.
34. Whenever a Boston Cab driver has been named as a defendant in an action arising out of the driver’s operation of the cab, Tutunjian, through EJT Management, has retained counsel to represent the driver and paid the driver’s attorneys fees.
35. Since approximately, 1991, Tutunjian’s nephew, Armen Mahserejian (“Mahserejian”), has worked for EJT Management. He became Vice President of Operations and is currently Operations Manager.
36. In the discovery phase of the instant case, Mahserejian was the Rule 30(b)(6) designee of EJT Management and of the other Tutunjian defendant corporations.
37. In the ordinary course, while the day to day management of Tutunjian’s cab companies has been left to Mahserejian, all matters of material significance to the companies are ultimately decided by Tutunjian or are subject to Tutunjian’s decision.
38. As to all the cab drivers of the defendant companies’ vehicles, Tutunjian testified, “They all drive for me.”
39. The expenses and income for each individual cab company are pooled into an EJT Management account. None of the individual cab companies has its own bank account, its own bills for repairs or gas or its own phone number.
40. Tutunjian testified that while he believed conducting an internal audit for each cab company was possible, he conceded that internal corporate documents for each company were not consistently prepared and kept in the ordinary course.
41. In keeping with the pooling agreement in effect, each of Tutunjian’s cab companies was charged a certain percentage of expenses incurred and revenue received by EJT based on the number of medallions owned by the individual cab company. Tutunjian’s accountant decides on the amount of the management fee.
42. An amount for an annual “insurance premium” is allocated to each of the Tutunjian cab companies on a per medallion basis. An excess for “insurance settlements” is allocated on a per medallion pro rata basis, as well.
43. Although certain corporate records and formalities were maintained, see Exhibits 72 and 73, in 2000 and up until 2005, there were are no corporate records of corporate meetings, votes, resolutions, transactions or other routine formal documentation of separate corporate activities conducted by the Tutunjian cab entities.
44. EJT Management maintains the vehicles by performing the regular maintenance and also making repairs. Employees of EJT Management receive a paycheck from the company.
45. Neither Elsie nor any of Tutunjian’s other cab companies has its own employees, and no employees receive paychecks from the individual cab companies.
46. Calls for cabs and the dispatch of Tutunjian’s cabs in response to such calls is handled on paper by Tutunjian’s company, Boston Cab Dispatch, Inc.
47. EJT Management funds defendant EJT Insurance Trust. When EJT Insurance Trust requires *520 funds, Tutunjian, through EJT Management, transfers funds to it.
48. EJT Management periodically funded substantial personal investments and expenses of Tutunjian and his wife. On occasion, EJT Management checks were written to the defendant Prime Securities, Inc. for the purpose of such personal investments. See Exhibits 59 and 60.
49. Among the personal investments and expenses funded by EJT Management were the purchase of a Chilean vineyard and associated winery and severed condominiums. In addition, EJT Management paid the real estate taxes on various personal investment properties of Tutunjian and his wife. See Exhibits 60A and B, 61A, 62, 62A-I and 76.
50. Tutunjian’s wife appears as the secretary on many of Tutunjian’s corporate documents. However, she has not provided any services to EJT Management or to the other companies.
51. Tutunjian testified that EJT Management funds his business needs and that he does not distinguish between any of his businesses in using the account.
52. Tutunjian viewed EJT Management as essentially a checking account for his business and, on occasion, personal needs.
53. Since May 2000 Tutunjian has personally guaranteed, and as corporate officer, has pledged and cross collateralized the assets of his taxi companies, including Elsie Cab, to secure loans from Sovereign Bank through an integrated credit facility. See Exhibit 75. At the time of the April 2008 trial, the line of credit through the Sovereign credit facility was $40 million. Exhibit 6B.
54. Pursuant to the Court’s attachment for post-verdict security, the assets of Elsie’s Cab, including its 15 medallions, were carved out of the intercompany cross-collateralized credit facility. Sovereign Bank’s security interest in such assets is currently subordinated to Hanley’s judgment.
55. The current market value of a single taxi medallion in the City is $375-$400,000.
Structure of the Tutunjian Companies’ Risk Management
56. Prior to 2000, Tutunjian insured his cabs by purchasing individual insurance policies for the cabs. Such policies provided the minimum mandatory $20,000 per claimant/$40,000 per accident (“20/40”) coverage pursuant to G.L.c. 90, §§34A and 34B. For instance, for the 1997-1998 time period, Tutunjian paid a $53,165 premium for seven cabs owned by Diamond Cab, Inc., one of Tutunjian’s cab companies. Exhibit 77.
57. At Mahserejian’s lead, in 1999-2000 the insurance set-up of Tutunjian’s cab fleet was reevaluated.
58. In lieu of obtaining what would otherwise be a minimum compulsory 20/40 insurance policy, G.L.c. 90, §§34A and 34B permit an owner of a motor vehicle to obtain a surety bond (a “motor vehicle liability bond”) that secures such limits in the event of an accident. If there is an accident and the owner fails to pay up to the 20/40 limit, a claimant may bring an action in the name of the Commonwealth against the surety for the balance.
59. In addition, G.L.c. 90, §34D permits an owner, in lieu of complying with the compulsory insurance requirement through a 20/40 policy or a 20/40 bond, to deposit a minimum of $ 10,000 in cash or securities with the state treasurer as security for direct and derivative claims against the owner.
60. At the completion of his evaluation of the Tutunjian fleet’s insurance arrangements, Mahserej-ian concluded that substantial cost savings could be achieved by the fleet becoming self-insured through the bonding and security deposit vehicles permitted by G.L.c. 90, §§34A, 34B and 34D. He so advised Tutunjian, and Tutunjian accepted Mahserejian’s recommendation to implement the change.
61. Thereafter, with Tutunjian’s approval, Mahserejian solicited proposals from four insurance consulting companies that provided claims processing services to self-insuring businesses. Arthur J. Gallagher Company (“Gallagher”), an international insurance consulting and claims management firm, responded to the RFP, and sometime in 2000 Mahserejian on behalf of Tutunjian engaged Gallagher as a third-party administrator to process all property and personal injury claims generated by Tutunjian’s taxicab fleet. (In 2005, Amity Insurance took over as Tutunjian’s third-party claims administrator.)
62. At the time Gallagher was engaged, a statutoiy 20/40 bond covered all of Tutunjian’s taxicabs.
63. Although the details of the relationship between the two was unclear from the evidence, it appears that at least as of June 2006, Elsie’s and Tutunjian’s other cabs were not covered by the statutory bond but rather exclusively by a $10,000 certificate of deposit (“CD”) for each cab pursuant to G.L.c. 90, §34D.
64. As is allowed by statute, the interest earned from the CDs were paid to EJT Management and deposited into an EJT Management bank account.
65. Once their risk management was structured through the c. 90, §34D CD vehicle, Elsie and the other Tutunjian cab companies entered into an “Insurance Claims Contribution Agreement” whereby the expenses and claims paid were essentially pooled among all the companies and allocated pro rata by medallion. Exhibit 23.
66. At the time of the Hanley accident, the statutory bond that covered the Elsie Cab taxi driven by Ginsburg and all the other Tutunjian cabs was written with the Arbella Mutual Insurance Company. There was a single bond. It was # 39 967 881-00. The bond was *521 titled, “Massachusetts Motor Vehicle Liability Bond.” Exhibit 7.
67. In relevant part, the bond read as follows:
We, [individually listed Tutunjian cab companies] as Principal(s) and Arbella Mutual Insurance Company, as surety, are bound and obligated to the Commonwealth of Massachusetts for the limits of liability as stated in the Massachusetts Automobile Insurance Policy (M.A.I.P.) for the Compulsory Insurance Coverage (Part 1), Bodily Injury to Others, (Part 2) Personal Injury Protection, (Part 3) damages that will be paid in performing this agreement will never exceed the limits of liability required by Coverage Part 1,2, 3, 4, of the (M.A.I.P.).
If the principal is unable to perform in accordance with this agreement the Surety agrees to perform.
This obligation is subject to the following provisions:
If a judgment is rendered against the Principal on this Bond, or against any person who, with the consent of the Principal, is responsible for the operation of the motor vehicle(s) covered under this Bond is not satisfied within 30 days, the person obtaining the judgment may, at his/her own cost, bring an action in the name of the Commonwealth of Massachusetts against the Surety.
No statements made by the Principal or on its behalf in securing this Bond or in securing registration of the motor vehicles covered, and no violations of the terms of this Bond, and no act or default by the Principal, will operate to void this Bond as against a person who has obtained a judgment against the Principal or, any person with the consent of the Principal, responsible for the operation of the motor vehicle(s).
In the event the Principal becomes bankrupt or insolvent and loses right [sic] to possession of the motor vehicles covered by this Bond with the Bond period, the Bond shall cover its legal representative during the unexpired portion of the Bond period to the same extent as Principal [sic] is covered under the Bond.
It is also understood and agreed that the General Provisions and Exclusions, Cancellation, and Renewal sections contained in the (M.A.I.P.) are also applicable to this Bond.
68. The statutoiy bond was executed in the name of “EJT Management, Inc.” as Principal.
69. Bonding of the other cabs in Tutunjian’s fleet was handled similarly. Exhs. 7, 10, 10A, 10B, 11,11A.
70. Lenda Young and Richard Dyer worked for Gallagher as claims representatives and were assigned to the Tutunjian account. Exhibits 19D, 21 and 80.
71. They and other Gallagher employees constituted what was referred to as EJT Management’s “Claims Department.” The Gallagher employees worked out of an office at 59 Queensbuiy Street, which was a building owned by Tutunjian.
72. Young and Dyer were experienced insurance industry claims adjusters. Dyer testified that he had 20 years of such experience before being hired on the Tutunjian account. Exhibit 19.
73. At all times material to the matter before the Court, the Gallagher personnel on the Tutunjian account used forms and followed practices similar to what they had done when they previously worked in the insurance industry.
74. The claims adjustment process for the Tutunj-ian fleet was overseen by Mahserejian. Exhibit 65.
75. In the ordinary course, Mahserejian allowed the Gallagher employees to settle claims up to $5,000 without consulting him. Claims with prospective exposure above that amount had to be reviewed by him.
76. As to claims having exposure above $20,000, Mahserejian typically engaged counsel to represent the drivers directly. In doing so, he referred the defense of the claims to a select number of experienced personal injury attorneys in whom he and Tutunjian had confidence.
77. Where counsel was engaged, the Gallagher claims adjusters were no longer significantly involved.
78. Mahserejian obtained Tutunjian’s approval on all substantial settlements before they were closed.
79. The cost of the defense of claims against Boston Cab drivers (as adjusted by the Gallagher personnel and settled or tried by legal counsel) was borne by Tutunjian.
80. The above process was followed in connection with the Hanley claim. Because of the Hanley claim’s order of magnitude, Gallagher personnel had only passing involvement with it. Gallaher’s role was limited to maintaining the claim file. Exhibits 19, 19A, 49 and 65.
81. Counsel was appointed to represent Ginsburg, and all fees for Ginsburg’s counsel (up to the present) were paid by Tutunjian.
Representations as to Insurance Coverage
82. In the ordinary course, when claimants, through their attorneys, would make a written demand of Boston Cab for the disclosure of insurance coverage pursuant to M.G.L.c. 175, §112C, the Gallagher claims representatives would respond with “limits letters” on forms customarily used by insurance carriers. The Gallagher lettersincluding that sent on the Hanley claimstated that the cab was covered by a 20/40 policy and cited a policy number. Exhibit 8A. The policy number referenced in the correspondence was the statutoiy bond number. The letters did not indicate that the defendant cab companies were self-insured. See Exhibits 9, 9A, 9B, 9C, 9E and 15A.
83. In all material respects, Gallagher responded in the same way that it would have had the Tutunjian *522 cabs actually have been covered by a 20/40 insurance policy. See Exhibit 80.
84. The limits letters were part of the claims management “Guide” prepared for and submitted to EJT Management by Gallagher at the outset of Gallagher’s retention.
85. The Gallagher correspondence to claimants, attorneys, and insurance companies was written on desktop publishing letterhead of the particular cab corporation that was the subject of the claim.
86. Although it is unclear from the evidence as to whether Mahserejian or Tutunjian ever physically reviewed the text of the limits letters, both were aware that Gallagher routinely represented that each Tutunjian cab and driver (including the vehicle involved in the Hanley accident and Ginsburg as its driver) had 20/40 coverage.
87. The Gallagher claims representatives, counsel for the drivers and Mahserejian did not disclose to the claimants that the Tutunjian fleet was self-insured. Exhibit 14D.
88. In communicating to claimants and their counsel that the Tutunjian cabs were covered by a 20/40 “policy,” as opposed to a statutory bond, the Gallagher representatives, counsel and Mahserejian misrepresented the insurance status of the vehicles and drivers.
89. Although the practice changed sometime in 2002, in 2000 Elsie and the other corporate taxi defendants represented on “Insurance Verification Forms” filed with Hackney that they were insured by Arbella Protective Insurance. Exhibits 10B and 11 A.
90. Counsel for Hanley was unaware of Elsie’s self-insured status until it was disclosed by Mahserej-ian in the course of his deposition as Tutunjian’s 30(b)(6) designee in October 2005.
91. The Gallagher claims adjusters also occasionally adjusted and settled claims for cabs owned by Tutunjian’s nephew, Rail Chapian (“Chapian”). Chap-ian operated as Milton Taxi, Inc. and Dedham Taxi, Inc. Exhibits 25 and 25A. The Gallagher personnel followed the same practices in adjusting and settling the Chapian claims as they did with the Tutunjian claims, including using the same limits letters. See Exhibit 26. They also did not disclose that Chapian’s companies were self-insured. See also Exhibits 28, 28A-B, 29, 30, 31 and 31-A-D.
92. For a period of time in the course of settling Tutunjian claims, the Gallagher personnel routinely charged other licensed, commercial insurance companies what is known as an “inter-company reimbursement fee” for handling subrogation settlements in connection with PIP entitlements. This is a 10% administrative fee allocated under the statute to insurance companies to cover their administrative costs of settlement. It was 10% of the settlement figure. The practice was terminated when the carriers being charged informed Gallagher that they would not pay the fee because EJT Management was not an insurance company. See Exhibits 20, 20A-D.
93. Settlements in excess of the 20/40 amounts have been paid over the years by Tutunjian to resolve personal injuiy claims arising from the operation of his taxis, including a settlement of $1.5 million. See Exhibits 15H, 18, 18F, 32, 33, 34, 36 and 36A.
94. Such settlements have been paid by the corporate entity of EJT Insurance Trust or Prime Securities, Inc. The settlement funds were transferred from EJT Management.
95. EJT Insurance Trust is listed in the phone book under general business alphabetical listings. Exhibit 16C.
96. Tutunjian has always paid in full all judgments and settlements involving any of his cab companies and drivers.
97. The expense of the self-insured settlements and judgments is carried as a line item on the financial statements of EJT Management. Exhibit 39B.
98. Hanley and other claimants were in substantially the same position on account of Elsie Cab’s and the other Tutunjian cab company’s being self-insured as they would have been had Elsie and the other companies been insured in fact by 20/40 policies. Exhibits 14D, 19, 26 and 65.
99. The misrepresentations as to the insurance status of the taxicabs and of the drivers by the Gallagher representatives, by counsel for Tutunjian’s drivers and by Mahserejian did not affect the substance of the claimants’ position vis á vis Tutunjian.
Tutunjian’s Posture on the Hanley Claims
100. Tutunjian, Mahserejian and counsel representing Elsie and Ginsburg refused to settle with Hanley because of their good faith belief that liability for Hanley’s injuries was not reasonably clear. This was due primarily to the circumstance that the accident was directly caused by the defendant Walker’s having run a blinking red light and to their belief that Ginsburg had been operating prudently.
101. The Tutunjian defendants agreed to non-binding mediation of Hanley’s claims. The mediation was unsuccessful. The terms of whatever offers or counteroffers were made in the course of the mediation were not part of the evidence.
102. Plaintiffs presented a G.L.c. 93A “Demand Letter” to the defendants by hand on August 8th 2006.
RULINGS OF LAW
G.L.c. 93A and Unfair Settlement Practices
1. G.L.c. 90, §34A provides that the Commonwealth’s compulsory motor vehicle insurance requirement can be satisfied by the owner’s obtaining a “motor vehicle liability bond” “to the amount or limit of at last twenty thousand dollars on account of injury to or death of any one person [and] of at least forty *523 thousand dollars on account of any one accident resulting in injury to or death of more than one person
2. G.L.c. 90, §34D provides that an “applicant for registration may, in lieu of procuring a motor vehicle liability bond or policy, deposit with the state treasurer cash in the amount of ten thousand dollars or bonds, stocks or other evidence of indebtedness satisfactory to the state treasurer of a market value of not less than ten thousand dollars as security for the payment by such applicant... of all judgments rendered against the applicant... for bodily injuries [etc.]”
3. G.L.c. 175, §181 provides:
No company, no officer or agent thereof and no insurance broker or insurance adviser shall make, issue, circulate or use, or cause or permit to be made, issued, circulated or used, any written or oral statement misrepresenting the terms of any policy of insurance or any annuity or pure endowment contract issued or to be issued by any company, or the benefits or privileges promised thereunder.
4. G.L.c. 176D, §1 provides:
When used in this chapter, the following words shall have the following meanings except as otherwise specifically provided: (a) “Person,” any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, operators of any medical service plan and hospital service plan as defined in chapters 176B, 176C, 176E and 176F, carriers and health maintenance organizations as defined in chapter 176G, insurers and sponsors of a legal services plan as defined in chapter 176H, any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law. For purposes of this chapter, operators of any such medical and hospital service plans and carriers and such health maintenance organizations shall be engaged in the business of insurance.
5. G.L.c. 176D, §2 provides:
No person shall engage in this commonwealth in any trade practice which is defined in this chapter as, or determined pursuant to section six of this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.
6. G.L.c. 176D, §3 provides:
The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:
(2) False information and advertising generally: making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading . . .
(5) False statements and entries: (a) knowingly filing with any supervisory or other public official, or knowingly making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or knowingly causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person: or (b) knowingly making any false entry of a material fact in any book, report or statement of any person or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person . . .
(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:
(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds].]
7.“[A] practice or act will be unfair under G.L. 93A, §2, if it is (1) within the penumba of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury [ ].” Morrison v. Toys “R” Us, Inc., 441 Mass. 451, 457 (2004), quoting Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991).
*524 8. “In determining whether an act or practice is deceptive, ‘regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have [on the alleged injured party],” Leardi et al. v. Brown, 394 Mass. 151, 156 (1985), quoting P. Lorillard Co. v. FTC, 186 F.2d 52, 58 (4th Cir. 1950). Further, “technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.” Leardi 394 Mass, at 159, quoting Baldassari v. Public Fin. Trust, 369 Mass. 33, 41 (1975).
9. In deciding whether a certain practice is “unfair” under G.L. 93A, “the nature of [the] challenged conduct and the purpose and effect of that conduct [are] the crucial factors . . Massachusetts Employers Insurance Exchange v. Propac-Mass., Inc., 420 Mass. 39, 42-43 (1995).
10. The multiple damages provision of the statute is reserved for particularly egregious conduct. “[The statute] ‘ties liability for multiple damages to the degree of the defendant’s culpability by creating two classes of defendants.’ Those defendants who have committed ‘relatively innocent violations’ of the statute are not liable for multiple damages, while a second class of defendants who have committed ‘willful or knowing’ violations are.” DataComm Interface v. ComputerWorld, Inc. et al., 396 Mass. 760, 779 (1986).
11. A “willful or knowing” violation is one where either the defendant affirmatively knew that a material representation was false or that the defendant made the representation with reckless disregard of its truth or falsity. See Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12 (1985). See also Anthony’s Pier Four, supra at 475.
12. At all times material to the complaint the Tutunjian defendants were engaged in trade or commerce.
Tutunjian’s Companies as Engaged in the Business of Insurance
13. “[T]he business of insurance” involves “profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices.” Poznik v. Massachusetts Med. Prof. Ins. Ass’n, 417 Mass. 48, 51 (1994).
14. To determine whether a particular entity is in fact “engaged in the business of insurance,” the Court must weigh the issue on a factor-by-factor basis. Id. at 51 (considering listed factors in concluding that the statutorily created Massachusetts Medical Professional Insurance Association was not engaged in the business of insurance); Liquor Liab. Joint Underwriting Ass'n of Mass. v. Great American Ins. Co., 2003 WL 21048793 at *24-27 (Mass.Super. 2003) [16 Mass. L. Rptr. 268] (Hines, J.) (considering listed factors in determining that Liquor Liability Joint Underwriting Association, a legislatively created underwriting association, was subject to G.L.c. 176D).
15. G.L.c. 176D and c. 93A do not apply to a self-insurer with an internal claims management department which has “no contractual obligation to settle the plaintiffs claim and [was] not otherwise regulated by the Commonwealth for insurance activities.” Morrison v. Toys R Us, 441 Mass. 451, 455 (2004).
16. “The gravamen of [G.L.c. 176D] is that an insurance company is required to deal in good faith with a claimant, whether an insured or a third-party, with respect to a claim which the insurance company is contractually obligated to pay. Absent a contractual obligation, there simply is no bad faith cause of action either at common law or by statute.” Id. at 458 n.3 (emphasis in original) (quoting with approval the Kentucky Supreme Court’s decision in Davidson v. American Freightways, Inc., 25 S.W.3rd 94, 100 (Ky. 2000), construing a substantively similar statute to G.L.c. 176D).
17. A legislative purpose of G.L.c. 176D is “to encourage settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief.” Id. at 454. The Morrison court further observed that “[o]ne obvious legislative concern was that entities that profit from selling insurance policies not abuse exclusive rights and duties to control litigation vested through those same policies.” Id.
18. To “self-insure" means:
the assumption of one’s own risk, instead of transferring it to a third-party insurer by means of purchasing insurance coverage. The term “self-insured” is a manner of referring to a decision not to be insured by a third party when one has the financial means (in fact or assumption) to satisfy claims or judgments imposing liability for wrongful conduct.
Id. at 458, n. 1. As such, the phrase refers to a business decision wherein a person or entity makes the decision to assume its own risk on the presumed assumption that it has the financial wherewithal to do so.
19. Tutunjian and his defendant companies were not in the “business of insurance” because there was no insurance policy through which they were contractually obligated to pay claims to Hanley or others and because Tutunjian and his defendant companies were not regulated as such by the Commonwealth.
20. Assuming arguendo that Tutunjian and his defendant companies were engaged in the “business of insurance,” they did not engage in unfair or deceptive trade practices that caused damage to Hanley.
21. The misrepresentations as to Elsie and Ginsburg being covered by a 20/40 policy (and similar misrepresentations to other claimants) did not affect any substantial right of Hanley’s (nor the substantial *525 rights of other claimants) and was, thus, immaterial. This is because Hanley was (and the other claimants were) in substantially the same position on account of Elsie being covered by the statutory bond and the $10,000 CD as they would have been if, in fact, Elsie and Tutunjian’s other companies had been covered by 20/40 policies of insurance.
22. By the explicit terms of the bond, the coverage limits under the bond and under a 20/40 policy were identical. Further, in both circumstances, the coverage limits were far less than the objective magnitude of the Hanley claims. Thus, any reasonable attorney representing Hanley would have known that to obtain a recovery commensurate with Hanley’s injuries, counsel would have had to press a claim against Elsie’s assets beyond the limits of the policy.
23. In fact, the latter is what counsel did (and accomplished) in this case.
24. Further, again assuming arguendo that Tutunj-ian and his companies were subject to G.L.c. 176D, the defendants did not engage in unfair and deceptive settlement practices with the plaintiffs. That is because liability was not reasonably certain.
25. “Whether the defendant’s liability . . . became ‘reasonably clear’ calls for an objective standard of inquiiy into the facts and the applicable law.” Demeo v. State Farm Mut Auto. Ins. Co., 38 Mass.App.Ct. 955 (1995). “That objective test calls upon the fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.” Id. at 956-57.
26. ‘The standard for examining the adequacy of an insurer’s response to a demand for relief under G.L.c. 93A, §9(3) is ‘whether, in the circumstances, and in light of the complainant’s demands, the offer is reasonable.’ ” Bobick, supra, 439 Mass. at 659 (internal citations omitted). But an insurer is “not required to put a fair and reasonable offer on the table until liability and damages [are] apparent.” Id.
27. Here, Tutunjian’s driver, Ginsburg, was proceeding down West Broadway with the right of way by virtue of his facing a flashing yellow traffic signal. While Hanley described Ginsburg as recklessly speeding, Ginsburg denied it. It was not unreasonable, under the circumstances, for Tutunjian to believe his driver rather than the passenger. This is so in particular because Hanley had mistakenly accused Ginsburg of having run a flashing red light.
28. Most significantly, it was the defendant Walker who, in fact, ran the red light and directly caused the accident. Moreover, the jury’s verdict, which found Walker 93% responsible vis-á-vis Ginsburg’s 7% and absolved Elsie Cab altogether of negligence and of negligent entrustment, strongly suggests that Tutunjian’s denial of liability before trial had an objectively reasonable basis.
29. While the effort did not result in a settlement, the Tutunjian defendants did agree to non-binding mediation of Hanley’s claims.
30. In final argument, counsel for Hanley and for Walker urged that the Court rule Tutunjian’s settlement conduct was unfair and unreasonable because the doctrine of contribution for joint tortfeasors was applicable on the facts of the case. By such doctrine Elsie was exposed to joint and several liability even if Ginsburg’s negligence was determined to be as little as 1% vs. Walker’s 99%. See generally Shantigar v. Bear Mountain Builders, 441 Mass. 131, 137-38 (2004). The prospect of that exposureeven if it were appropriate to take into account, and it may not besee belowdoes not affect the Court’s conclusion that it was reasonable for Tutunjian to believe that Elsie and Ginsburg had no liabiliiy for the accident. The core fact of the accident was that Walker ran a red light and crashed broadside into Ginsburg’s cab while he had the right of way.
31. However, it appears that the SJC in Bobick directs that in this circumstance a trial judge ought not consider the prospect of joint and several liability as part of the 176D calculus. There, the SJC (Greaney, J.) stated: “We reject the plaintiffs argument that the doctrine of joint liability, which allows an injured plaintiff to proceed against, and recover damages from, any or all joint tortfeasors, operates in these circumstances. The statutes at issue were enacted to encourage the settlement of insurance claims and to discourage insurers from forcing claimants into unnecessary litigation to obtain relief, but do not require an insurer to settle not only its own, but another solvent tortfeasor’s liability. We are aware of no authority that supports the plaintiffs position.” 439 Mass, at 661.
Corporate Veil Issues
32. It is a “bedrock principle! ] of corporate common law” that “corporationsnotwithstanding relationships between or among themordinarily are regarded as separate and distinct entities” for purposes of being subject to liability." Scott v. NG US 1, 450 Mass. 760, 766 (2008).
33. “[T]he concept that ‘a parent corporation (so-called because of control through ownership of another corporation’s stock) is not liable for the acts of its subsidiaries,’ is ‘deeply ’’ingrained in our economic and legal systems," ’ United States v. Bestfoods, [524 U.S. 51, 61-62 (1998)], and assures that ‘the exercise of the “control” which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary.’ Bestfoods, supra at 61-62. Also settled is the equil-ibratory concept that the corporate veil between parent and subsidiary corporations may be pierced when, ‘inter alia, the corporate form would otherwise be misused to accomplish certain wrongful *526 purposes, most notably fraud.’ Best Foods, supra at 62." Scott, 450 Mass. at 766.
34. “In Massachusetts, the equitable doctrine of corporate disregard differs in no material respect from the description in Bestfoods, supra at 62-63 . . . [Corporate veils are pierced only in ‘rare particular situations,’ and only when an ‘agency or similar relationship exists between the entities.’ ” My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619-20 (1968).
35. The SJC has held that the corporate veil may be pierced where:
(1) there is some form of pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or
(2) there is “a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.”
Scott, 450 Mass. at 767, quoting My Bread, 353 Mass. at 619.
36. The My Bread Court further noted that the second prong is operative in those “rare particular situations in order to prevent gross inequity.” 353 Mass, at 620.
37. In Scott the SJC further explained that “[u]ltimately, the decision to disregard settled expectations accompanying corporate form requires a determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose, based on the consideration of twelve factors. Scott, 450 Mass. at 768. These twelve factors are:
(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation’s funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.
Id., quoting Attorney General v. MCK, Inc., 432 Mass. 546, 555 n. 19 (2000), in turn citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, 754 F.2d 10, 14-16 (1st Cir. 1985).
38. “One examines the twelve factors to form an opinion whether the over-all structure and operation misleads. There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing." Evans v. Multicon Const. Corp., 30 Mass.App.Ct. 728, 736 (1991).
39. In applying the above twelve factors to Tutunj-ian, one finds them substantially even. Those that point to the conclusion that the Tutunjian corporate veil should be pierced are the five factors of (1) common ownership, (2) pervasive control, (3) confused intermingling, (5) non-observance of corporate formalities and (11) use of the corporation for the transactions of dominant shareholders. Pointing in the opposite direction are the factors of (4) capitalization, (8) solvency and (12) no demonstration of fraud. The remaining factors are either not applicable(7) payment of dividendsor inconclusive(6) absence of corporate records, (9) siphoning of assets and (10) non-functioning of officers and directors. The Appeals Court has cautioned, however, that “the [12 factor] exercise is, of course, not one of counting.” Evans, 30 Mass.App.Ct. at 736.
40. Inasmuch as the veil piercing doctrine is equitable in nature and depends most fundamentally on a conclusion that in the absence of corporate formalities being set aside, some wrong in the nature of fraud or gross inequity would occur, there is not the occasion to apply it in this case. As Hanley’s counsel acknowledged in colloquy with the Court in final argument, the plaintiffs are adequately secured on the original judgment by virtue of the Court’s post-verdict attachment of Elsie’s fifteen medallions. Further, the record is uncontradicted that Tutunjian has always paid in full any settlements or judgments arising from accidents involving his cabs.
41. In the final calculus, there is no reason to pierce the corporate veil because there is not a wrong to be righted by the Court doing so.
ORDER
Judgment shall enter for the defendants on all counts tried to the Court.